**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MATTHEW W. STEIN, | ) | Case No. 3:21-32162 |
| | ) | |
| Debtor | ) | Chapter 7 |
| | ) | |
| _____ | ) | |
| | ) | |
| MATTHEW W. STEIN, | ) | Adversary Proc. No. 22-3004 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| c/o Internal Revenue Service, | ) | |
| | ) | |
| Defendant. | ) | |

* * * * *

**MEMORANDUM OPINION**

This matter is before the Court on the Adversary Complaint of Debtor-Plaintiff Matthew Stein ("Debtor" or "Stein"), [R. 1],[1] in which Stein requests that the Court enter a judgment declaring that the federal income tax liabilities listed in his schedules are dischargeable.  In response, the United States, on behalf of the Internal Revenue Service ("IRS"), seeks a judgment excepting from discharge $1,074,180.57,[2] a sum that represents fourteen years, 2002, 2003, 2005 through 2015, and 2017 (the "Period in Contention"), of Stein's unpaid federal income taxes.  The government argues that Stein's tax liabilities should be excepted from discharge under 11 U.S.C.

---

[1] Unless otherwise stated, all record citations herein are to the adversary proceeding docket, case no. 22-3004, as opposed to the docket of the main bankruptcy case.
[2] As of November 21, 2022, Stein owed $1,074,180.57 in unpaid taxes and interest, all penalties having been discharged through the bankruptcy.  [R. 58 at 5].

§ 523(a)(1)(C) because, over the Period in Contention, he attempted to evade payment, or collection, of these obligations. For the reasons set forth below, this Court excepts these tax liabilities from Debtor's discharge, finding that Stein engaged in willful attempts to evade their payment or collection.

## FACTUAL BACKGROUND

### I.    Income and Real Property Ownership

Apart from a brief stint during college, Matthew Stein has been a lifelong resident of Louisville, Kentucky. He received his bachelor's degree from the University of Kentucky in 1986 and his Juris Doctor from the University of Louisville in 1989.

In 1985, Stein married Deborah Nutt ("Deborah" and together "the Steins"), a union that endured for approximately thirty years. The Steins have four sons, Matthew, William, Nathaniel ("Nate"), and Michael Lee, all of whom had reached the age of majority by the time of the trial on this matter. Around June of 2015, near the apex of their tax troubles, the Steins divorced. At the time of the trial in this matter, Stein was dating a woman named Lynn Voss ("Voss").

Throughout the course of his career, Stein has practiced plaintiff-side personal injury law. Generally, Stein has used a contingency fee agreement with his clients as his means of compensation, a model that has required him to advance expenses on behalf of his clients in many instances. Stein has built a relatively lucrative and successful legal practice using this compensation model, earning an average annual adjusted gross income for the Period in Contention of $222,536. During the fourteen years encompassed by the Period in Contention, Stein's annual adjusted gross income breaks down as follows[3]:

---

[3] These amounts are taken from the IRS's Summary of Stein's Federal Income Tax Filing and Payment History, [R. 79-10], a detailed accounting of the amounts Stein owed but failed to pay during the Period in Contention. Stein had no objections to this data at trial, stipulating to its use, and the IRS agent testified to the accuracy of the data

| | |
|---|---|
| **2002** | $339,219 |
| **2003** | $127,958 |
| **2005** | $130,958 |
| **2006** | $157,405 |
| **2007** | $221,412 |
| **2008** | $135,440 |
| **2009** | $160,073 |
| **2010** | $151,911 |
| **2011** | $259,882 |
| **2012** | $310,447 |
| **2013** | $181,688 |
| **2014** | $235,977 |
| **2015** | $192,249 |
| **2017** | $510,885 |
| **TOTAL** | **$3,115,504** |
| **AVERAGE** | **$222,536** |

Notably, Stein's income, while not the same in each of the years comprising the Period in Contention, was nonetheless consistently high.

Over the course of their marriage, the Steins owned, and inhabited, three residential real properties in desirable Louisville neighborhoods. They also purchased a fourth property for a family member during the period of their marriage. The first property was located on Iola Drive (the "Iola Home") and was purchased by the Steins in 1997 for $127,900.[4] The Steins lived in the Iola Home until around 2002.

In 2001, Stein purchased a second house, located on Glenview Avenue (the "Glenview Home"), for $225,000.[5] But Stein never lived in this home.[6] Instead, he purchased the Glenview Home for his brother-in-law's family to inhabit.[7] To purchase this home, Stein made a down

---

therein. When including years outside of the Period in Contention, Stein's average gross income ("AGI") between 2001 and 2022 was $208,870 and his average AGI was $199,127. AGI represents the taxpayer's income, after deductions for items like self-employment tax, education loan interest, and self-employed health insurance expenses.
[4] June 28, 2023 Trial Transcript, [R. 121 at 53:21-54:5].
[5] [R. 121 at 56:16-58:16].
[6] [R. 121 at 57:22-23].
[7] [R. 121 at 57:2-4, 15-17].

3

payment of around $10,500 and took out a loan for around $214,500.[8]  For a time Stein's brother-in-law paid rent to the Steins to cover the mortgage payments, but he eventually ceased making these payments.[9]  Thereafter, Stein made the mortgage payments himself while also paying the mortgage for his home.[10]

In 2002, the Stein family had outgrown the Iola Home, so they purchased a home on Trinity Road (the "Trinity Home") for $409,000.[11]  To acquire the Trinity Home, the Steins paid $141,500 as a down payment and borrowed $267,500 from U.S. Bank, securing this obligation with a mortgage on the property.[12]  After purchasing the Trinity Home, the Steins rented the Iola Home to Deborah's sister.[13]  Stein would occasionally pay the Iola Home mortgage when his sister-in-law could not afford to do so.[14]  In 2004, after some financial difficulties, the Steins moved back to the Iola Home as renters.[15]

Subsequently, in July of 2008, the Steins moved into a home on Hurdle Way (the "Hurdle Home") which was acquired on behalf of the family in a complex, and unusual, manner.[16]  Stein convinced Joseph Herp ("Herp"), a close personal friend of the Stein family, to purchase the home for $235,000.[17]  To buy the Hurdle Home, Herp paid $47,000 upfront and financed the remaining $188,000 with a loan secured by a mortgage.[18]  The $47,000 down payment made by Herp came from Stein through an entity called MWNM, LLC ("MWNM").[19]  Stein organized MWNM

---

[8] [R. 121 at 58:21-22, 59:8-10].  The loan appears to have been a balloon mortgage, with regular mortgage payments to cover interest and a lump-sum due at the end of the mortgage period.  [R. 121 at 58:8-20].
[9] [R.121 at 57:24-58:5].
[10] [R. 121 at 58:3-13].
[11] [R. 121 at 60:3-7].
[12] [R. 121 at 60:8-14].
[13] [R. 121 at 54:13-16].
[14] [R 121 at 54:20-25].
[15] Though the Iola Home was auctioned in 2004, it was purchased by "really good friends" of the Steins who allowed them to continue to live there and pay rent.  [R. 121 at 55:8-19].
[16] [R. 121 at 61:12-24].
[17] [R. 121 at 61:18-62:11].
[18] [R. 121 at 62:12-16].
[19] [R. 121 at 65:3-14].

approximately two weeks prior to Herp's purchase of the Hurdle Home, naming the entity after his sons.[20]   Subsequently, in 2009, MWNM entered into a contract for deed with Herp to acquire the Hurdle Home.[21]   Stein initiated and organized the contract for deed transaction between MWNM and Herp.  The Steins' interest in the Hurdle Home was further protected by an agreement between Stein and Herp providing for the transfer of the residence to William Stein by devise upon Herp's death.[22]   The Steins lived in this home for about ten years.

## II.    Pizza Business History and Change in Asset Management

Although Stein's legal practice was lucrative, he sought to increase his income by opening a pizza business called Pizza Guy Incorporated ("PGI") in 1997.  PGI operated a series of carryout and delivery pizza stores in, and around, the Louisville metropolitan area.  Initially, PGI was successful so, in 1999, Stein created Pizza By The Guy, Incorporated ("PBTG" and together "the Pizza Businesses"), a business similar to PGI.  Contemporaneous with the founding of PBTG, Stein borrowed $50,000 from his parents to fund the operations of the Pizza Businesses.[23]

Despite receiving this infusion of cash, the businesses needed additional capital, so in 2001 Stein obtained a loan of approximately $500,000 from the Small Business Administration ("SBA") which was facilitated by Stockyards Bank & Trust ("SBT").[24]   To secure the SBA loan, Stein pledged the Pizza Businesses, the Trinity Home, the Glenview Home, and the Iola Home.[25] Additionally, in 2001 Stein obtained a separate $250,000 unsecured line of credit from U.S. Bank which he also used to help fund the Pizza Businesses.[26]   Not long after these transactions, the Pizza

---

[20] [R. 121 at 62:5-7].  "MWNM" is an acronym comprised of the first letters from the names of each of Stein's sons, Matthew, William, Nate, and Michael Lee.  [R. 121 at 62:3-4].
[21] [R. 121 at 62:17-23].
[22] [R. 121 at 77:5-10].
[23] [R. 121 at 131:6-12].
[24] [R. 121 at 132:16-133:9].
[25] [R. 121 at 132:19-22].
[26] [R. 121 at 133:9-15].

Businesses began to falter and eventually ceased operations. By November of 2001, the Kentucky Secretary of State administratively dissolved the Pizza Businesses. Contemporaneously, the IRS levied on the Steins' bank accounts during both 2001 and 2002 to collect delinquent taxes.[27] Subsequently, sometime in 2004, Stein defaulted on the SBA loan. As a result, SBT foreclosed on his Iola, Glenview, and Trinity Homes, and U.S. Bank filed a separate lawsuit against Stein.

Starting in 2004, Stein began to change his money management practices. He began using cash, or cash equivalents, as his exclusive means of conducting any type of financial transaction. Due to this decision, Stein had to visit multiple locations each month to pay bills for various services. He even used cash for large expenses such as mortgage payments, the down payment for the Hurdle Home,[28] the three estimated tax payments he made during the Period in Contention,[29] and tuition payments to his sons' high schools and colleges. During the trial, Stein testified that he was able to make these large lump sum payments because he kept cashier's checks and cash "in his sock drawer."[30]

After the collapse of the Pizza Businesses, Stein changed not only his cash management practices, but also his willingness to title personal or real property in his name. It was during this period that Stein organized and implemented the byzantine process by which his family acquired an interest in the Hurdle Home. Further, from around 2009 onward, Stein never had a vehicle titled in his own name, instead titling vehicles he purchased in the name of his parents or children.[31]

---

[27] [R. 121 at 192:24-195:15].

[28] This was a $47,000 lump sum payment.

[29] The three estimated lump sum payments Stein made were in 2011 for $1,500, in 2012 for $5,000, and in 2017 for $4,000.

[30] [R. 121 at 195:16-196:12].

[31] Stein purchased a 2000 BMW 3-Series around 2007 and still had the vehicle in 2009. [R. 121 at 106:9-107:6]. He gifted the BMW to two of his sons sometime around 2009, at which point it was titled in those sons' names. [R. 121 at 107:7-12]. Stein purchased a 2009 Honda Odyssey in 2010 and titled the vehicle in his parents' names. [R. 121 at 109:15-110:5]. The Court heard no testimony regarding any vehicle titled in Stein's name after he gifted the BMW to his sons around 2009.

At trial, Stein claimed that he found this convoluted process of asset management and bill payment more convenient than modern banking or property ownership.  He also claimed that certain of these asset management practices were necessitated by his poor credit rating.  However, both the Steins provided testimony that points to other factors which caused their asset management changes.  For example, during a deposition in October of 2022 conducted by the IRS, Deborah testified that, upon the failure of the Pizza Businesses, she and her then-husband Stein stopped using bank accounts and credit cards, because they feared creditors would attach liens to their property or seize their assets.  Deborah explained that they were "afraid to have to put things in a bank account that it was going to be taken away [sic]."[32]  During his own deposition in November of 2022, Stein echoed this sentiment, explaining that MWNM initially held an interest in the Hurdle Home because the Steins "didn't want any of the property to be foreclosed on or -- or liens put all over it."[33]  Stein also acknowledged that his use of cash was motivated, at least in part, by a desire to avoid creditor levies on bank accounts held in his name.[34]  Stein's post-trial "Proposed Findings of Fact and Conclusions of Law" likewise acknowledges that his "use of cash to pay his bills was not only convenient but was necessary for him and his family to survive in modern society, given the personal judgments against him in favor of two banks, and Metro government."[35]

Eventually, Stein partially repaid the various loans associated with the Pizza Businesses.  From 2002 to 2009, Stein repaid the $50,000 loan from his parents.[36]  Subsequently, between

---

[32] June 29, 2023 Trial Transcript, [R. 122 at 7:10-19].
[33] June 28, 2023 Trial Transcript, [R. 121 at 72:17-73:15].
[34] [R. 121 at 196:13-18].  Additionally, Stein acknowledged that, "in a philosophical sense," a benefit of not having a bank account is the inability for creditors to levy.  [R. 121 at 202:16-18].
[35] Findings of Fact and Conclusions of Law, [R. 131 at 5].
[36] June 28, 2023 Trial Transcript, [R. 121 at 131:6-18].

2008-2009, Stein made partial payments of around $10,000 and $20,000 on the remaining obligations owed to SBT and U.S. Bank which did not fully satisfy either obligation.[37]

Stein continued to utilize this process for cash and asset management through the time of the trial on this matter. However, due to his relationship with Voss, Stein has garnered access to the use of a credit card. Voss added Stein as an authorized user of her Southwest credit card and he pays her cash to account for any charges he makes on that card.[38]

## III.    Lifestyle and Expenses

The Steins enjoyed a comfortable lifestyle during the Period in Contention. As noted above, during this period, they purchased four homes in desirable Louisville neighborhoods. The cost to acquire and maintain these homes was considerable. However, the Steins' most significant expense was not for housing, but, instead, for their sons' tuition. The Steins spent at least $184,000 on tuition over the entire time that their four sons attended private Catholic schools.[39] After their sons graduated from high school, the Steins paid an addition $133,000 in tuition.[40] Over the entire period of their children's education the Steins paid approximately $317,000 in tuition. During the fourteen-year Period in Contention, Stein made approximately $274,390 in tuition payments.[41] Stein has emphasized the personal, and familial, importance he placed upon his children's

---

[37] June 29, 2023 Trial Transcript, [R. 122 at 39:8-18, 140:22-141:12]. Stein testified that he made these partial loan repayments to SBT and U.S. Bank around 2008 or 2009. [R. 122 at 140:23-141:10]. SBT and U.S. Bank subsequently continued their attempts to collect from Stein via bank garnishments, but as Stein had adopted a cash-only lifestyle by then, the banks' attempted garnishments never attached to any funds. [R. 122 at 142:9-11]. Stein further testified that he believes the banks ceased their collection efforts entirely once the IRS filed suit against him in 2013. [R. 122 at 141:24-142:4]. Where SBT and U.S. Bank, Stein's two largest creditors besides the IRS, were unable to collect anything from him from 2009 onward, Stein's use of cash exclusively from that point onward was presumably designed to thwart the IRS.

[38] June 28, 2023 Trial Transcript, [R. 121 at 179:1-7].

[39] Stein testified that he spent at least $144,225 on his sons' private high school education. [R.121 at 19:12-15]. Additionally, Stein testified that tuition for his sons' private grade schools was around $2,000 per year. [R.121 at 35:24-36:8, 41:25-42:18, 230:5-14]. His sons attended private grade schools for a combined twenty years.

[40] Stein testified that he paid $133,122.47 for his sons' college tuition. [R.121 at 86:17-19].

[41] The amount paid in some years is estimated, but this total amount is based on what Stein admitted to paying at trial.

attendance at specific Catholic Schools.[42]    Stein also testified that he and his ex-wife never considered sending their children to public, or less expensive private, schools.[43]

In addition to paying tuition expenses and taking on the costs of multiple houses simultaneously, Stein chose to make other significant, discretionary expenditures between 2001 and 2019.  A summary of these expenses over the Period in Contention is as follows:

| Date | Purchase | Amount |
|---|---|---|
| 2002 | Down payment for Trinity Home | $141,500 |
| 2006 | Payment to SBT | $10,000 |
| 2006 | Country club membership | $250/mo x 3 or 4 |
| 2007 | BMW for sons William and Matthew | $15,000 |
| 2009 | Charitable contribution to UofL | $1,500 |
| 2009 | BMW | ~$15,000-$20,000 |
| 2015 | Honda Odyssey for Michael Lee | $3,000 |
| 2015 | Taxes for son William | $74 |
| 2016 | Repay student loan | $28,000 |
| 2016 | Taxes for son Nate | $269.73 |
| 2016 | Taxes for son Matthew | $2,418.35 |
| 2017 | Repaying loan from Bruce Kramer | $57,167 |
| 2002-2009 | Repaying loan from parents | ~$50,000 |
| 2002-2015 | Debbie's network marketing business | $50,000 |
| 2002-2017 | Charitable contributions total | $35,949 |
| 2002-2017 | Sports | $10,000-$15,000 |
| 2002-2017 | Christmas and birthday gifts for sons | ~$12,000 |
| 2002-2017 | Gifts to brother | $10,000 |
| 2013-2014 | Repair and shipment of Lexus | $4,900 |
| 2013-2015 | Payment to U.S Bank | $22,250 |
| After 2002 | Watch for Debbie | $500-$600 |

These expenses exclude Steins' acquisition and carrying costs for the Glenview and Iola Homes.

## IV.    History with the IRS

---

[42] [R. 121 at 43:6-9].
[43] [R. 121 at 43:6-12].

Prior to 2001, Stein habitually sought extensions of time to file his tax returns, but he generally made estimated payments to the IRS. After the collapse of the Pizza Businesses, however, Stein began to avoid the payment of his tax obligations *in toto*. During the Period in Contention, Stein utilized the services of an accountant to prepare his tax returns, each of which Stein reviewed, signed, and filed himself.[44] Stein filed these returns indicating that he owed taxes, but failed to pay the IRS anything.[45] In fact, over the Period in Contention, he reported a total of approximately $3,115,000 in adjusted gross income ("AGI")[46], and about $870,000 in taxes owed, but he only paid approximately $65,000 of that liability.[47] His refusal to pay taxes occurred at each stage of the tax reporting process – to wit he failed to pay: (i) estimated taxes, (ii) taxes at the time he filed for an extension, or (iii) any sum owed after he filed his return.[48]

Stein does not dispute that he failed to pay his income taxes for the years at issue. Instead, he attributes this failure to pay taxes to his oscillating income as a self-employed attorney and a lack of funds after he paid all other expenses of his family. Other than the expense of his sons' tuition, Stein points to medical bills and litigation expenses he advanced on behalf of clients as significantly depleting his income. However, for nine of the fourteen tax years at issue, Stein itemized deductions such as real estate taxes, mortgage interest, and charitable gifts, but never itemized any medical or dental expenses.[49] Similarly, he did not provide any substantial documentation to support his claims of losses associated with legal expenses he advanced on behalf of his clients.

---

[44] [R. 121 at 9:3-21].
[45] June 27, 2023 Trial Transcript, [R. 120 at 59:4-17, 102:21-23].
[46] AGI represents the taxpayer's income, after deductions for items like self-employment tax, education loan interest, and self-employed health insurance expenses.
[47] According to IRS records, Stein paid a total of $65,321 in taxes during the Period in Contention. [R. 79-10].
[48] [R. 120 at 59:4-17, 102:21-23].
[49] During the tax years at issue, taxpayers could itemize any unreimbursed medical and dental expenses that exceeded 7.5% of their adjusted gross income, but Stein explained he never utilized this benefit, as his medical expenses never rose to the 7.5% threshold requirement. [R. 122 at 99:8-21].

The collapse of the Pizza Businesses around November of 2001 also marked the moment that Stein began his attempts to slow the IRS's assessment and collection of his tax obligations. This process started with Stein's annual requests to extend the deadline for the filing of his returns in each year during the Period in Contention. These extensions, which are automatically granted, delayed the initiation of any action, assessment, or collection, by the IRS for four to six months in each year at issue. Over the course of the entire Period in Contention, these extensions combined to delay the IRS's collection activities by a cumulative amount of seven years.[50]

Stein also employed a number of techniques to slow, or prevent, the IRS's collection of his taxes. The IRS provided evidence of several instances when Stein informed the agency that he would begin making payments on his tax debt because his business performance had improved.[51] For example, in January of 2003, Stein entered into a repayment plan with the IRS to satisfy his 2002 taxes.[52] Despite entering into this agreement, Stein never made a single payment towards the plan, forcing the IRS to cancel it after eight months.[53] In March 2011, when the IRS called Stein to demand payment and inquire about his financial position, Stein stated that his financial position had improved and that he could begin making payments on his tax debts during 2011.[54] But Stein did not make these promised payments. Further, after the IRS placed a nominee lien on the Hurdle Home in early 2012, Stein told the IRS that he would make his tax debts a priority and allocate $5,000 per month towards this obligation.[55] Stein also told the IRS that during the coming year he would receive a settlement with fees in excess of $1 million which he would use to pay his tax obligations.[56] Soon thereafter, on March 12, 2012, Stein said he would begin delivering

---

[50] [R. 120 at 98:6-99:24].
[51] Stein's ICS History for 2011-2014, [R. 74-1 at 4, 6, 22-23].
[52] [R. 120 at 77:14-22].
[53] [R. 120 at 77:23-78:9].
[54] Stein's ICS History for 2011-2014, [R. 74-1 at 4].
[55] [R. 74-1 at 22].
[56] [R. 74-1 at 22].

payments on an installment agreement the following week.[57]  Again, Stein never made any of these promised payments to the IRS.  In each of these examples, Stein effectively forestalled the IRS's collection attempts for a significant period.

Stein's habit of obscuring his ownership of assets also slowed, or prevented, the IRS from collecting his taxes.  The most obvious example of this is the complex transaction he devised to acquire the Hurdle Home property so that the IRS could not identify it.  Despite the Hurdle Home's obfuscated title, the IRS eventually discovered Stein's interest in the property and, around January of 2012, imposed a nominee lien on it.[58]  In a further example of his evasive behavior, Stein told the agency that his son and law partner, the ostensible owners of the residence, would pay the sums needed to satisfy the nominee lien.[59]  However, in actuality, Stein satisfied the lien by paying $23,000 of the outstanding sum from cash on hand and borrowing the balance of $50,000 from his sister-in-law.[60]

Overall, Stein's efforts to hide his assets and slow the IRS's collection attempts were sufficiently effective that the agency deemed him to be a "hardship case," meaning the IRS had concluded that his debts were uncollectable.  The IRS made hardship determinations related to Stein on two occasions in May of 2005 and June of 2009.[61]  After each of these instances, evidence

---

[57] [R. 74-1 at 23].
[58] June 27, 2023 Trial Transcript, [R. 120 at 150:5-13]; [R. 121 at 73:16-18].  Under the "nominee theory," where a taxpayer has placed his or her assets in the name of another person or entity, but substantive ownership and control of the assets remain with the taxpayer, a nominee situation exists and the IRS may impose a lien on the assets held in the name of the taxpayer nominee.  *See* Internal Revenue Manuals (I.R.M.) 5.17.14.2.4.
[59] [R. 120 at 171:1-14].
[60] When asked why it mattered who was supplying the money to release the nominee lien, the IRS agent explained that the "whole purpose of [the IRS] doing this agreement is that we're getting $70,000 from two other parties, not Mr. Stein," the individual from whom they were already seeking to collect.  [R. 120 at 171:24-172:1].  In other words, Stein paid the IRS with money that he already owed them and was actively sheltering to avoid the agency's liens.
[61] [R. 120 at 125:5-126:8].

emerged that Stein had additional assets or income that could be collected, spurring the IRS to reopen his case for investigation.[62]

In July of 2013, the IRS ran out of options, and patience, in its pursuit of Stein and filed an action against him to collect his tax liabilities.[63]  Ultimately, in 2015, Stein entered into an agreed judgement with the IRS in which he conceded that he owed $594,111 in taxes for 2002, 2003, and 2005 through 2010 (the "Agreed Judgement").  The Agreed Judgement notwithstanding, Stein immediately reverted to his habit of seeking extensions, filing returns which reported taxes owed, while paying the IRS nothing at all.  This pattern was consistent from 2013 through 2017, the glaring exceptions coming in the form of a payment with his return in 2016 and a single estimated payment in 2017.

Due to his reversion to form after the Agreed Judgement, the IRS brought an enforcement action against Stein in 2017.  In response, Stein consented to an order (the "Consent Order") mandating two types of deductions from his income: first, he was required to withhold sufficient sums to pay his ongoing tax obligations; and second, the IRS levied a garnishment on his pay to reduce his tax debts.[64]  The Consent Order ensured that Stein made some payments on the Agreed Judgement while also remaining current on his ongoing tax obligations.  It did not, however, relieve him of the obligation to pay additional sums over, and above, the amount of the garnishment to satisfy the Agreed Judgment.  Due to the tax withholding component of the Consent Order, Stein has paid his income taxes since 2018.

## V.    Procedural History

---

[62] [R. 120 at 125:5-12].
[63] The IRS filed its action against Stein in the United States District Court for the Western District of Kentucky.
[64] [R. 121 at 217:21-218:25].

On October 28, 2021, Stein sought relief under Chapter 7 of the Bankruptcy Code.  Among the unsecured debts that he listed on his schedules, he included a debt of $453,812 owed to the IRS for income taxes incurred between 2001 and 2017.[65]  After receiving a discharge of his obligations in his bankruptcy case, Stein initiated the instant proceeding to determine whether his taxes should be discharged as well.[66]  The IRS responded to the complaint asserting that Stein's taxes from the Period in Contention should be excepted from discharge under § 523(a)(1)(C).[67]

Stein has never disputed that he owed taxes and failed to pay them, but asserts that mere non-payment, by itself, is insufficient to satisfy the mental state requirement for exception from discharge under § 523(a)(1)(C).[68]  Stein rebuffed the IRS's contention that he spent his income on lavish lifestyle expenses instead of taxes he knew he owed.  Rather, he argued that his inability to pay was due to his life circumstances—e.g. the failure of the Pizza Businesses, his fluctuating and unpredictable annual income, the cost of his sons' tuition, and Deborah's support payments—not an inherent desire to avoid his tax obligations altogether.  Stein argued that none of the "badges of fraud" found in other § 523(a)(1)(C) cases were present here, and that his failure to pay taxes was not due to any devious motive or intent.[69]  In fact, he argued that the government was required to demonstrate specific intent, a hurdle it could not overcome.[70]  He also stressed his willingness to comply with the IRS, as demonstrated by the fact that he voluntarily filed returns every year, regularly requested extensions, and generally cooperated with the IRS rather than actively evading the agency.[71]

---

[65] Main Bankr. Case. No. 21-32162, [R. 6 at 18].
[66] Adversary Proceeding 22-3004, [R. 1 at 3].
[67] [R. 4 at 3].
[68] "Debtor/Plaintiff's Trial Brief," [R. 60 at 15-16].
[69] [R. 60 at 5].
[70] [R. 60 at 16].
[71] [R. 60 at 2-5, 8].

The IRS countered that Stein's actions during the Period in Contention satisfied both the conduct and mental state components of § 523(a)(1)(C). To demonstrate that the conduct element was satisfied in this case, the IRS offered evidence of Stein's ability to pay his taxes, his sizable discretionary expenses, and his secretion of assets.[72] The mental state element was met, according to the IRS, by proof of Stein's lavish spending, concealed assets and structured finances, and lack of genuine cooperation with the agency.

Between June 27 and June 29, 2023, the Court conducted a three-day trial on this matter. Thereafter, on October 25, 2023, the parties filed their post-trial briefs and the matter was submitted for decision by the Court.

## LEGAL ANALYSIS

Section 523(a)(1)(C) of the Bankruptcy Code excepts from discharge under § 727 a tax debt for which the debtor "made a fraudulent return or willfully attempted in any manner to evade or defeat such tax." 11 U.S.C. § 523(a)(1)(C). "The Sixth Circuit has interpreted the Code's phrase 'willfully attempted in any manner to evade or defeat such tax' as requiring a voluntary, conscious, and intentional evasion." *Stamper v. United States* (*In re Gardner*), 360 F.3d 551, 557 (6th Cir. 2004) (quoting *In re Toti*, 24 F.3d 806, 809 (6th Cir. 1994), *cert. denied*, 513 U.S. 987 (1994)).

The Sixth Circuit has clarified that § 523(a)(1)(C) covers both "acts of omission, such as failure to file returns and failure to pay taxes, and acts of commission, such as affirmative acts of evasion" from revenue agents. *Stamper*, 360 F.3d at 557; *Toti*, 24 F.3d at 809. Subsequently, in *Stamper*, this circuit added that, "while nonpayment alone is insufficient to bar discharge of a tax obligation, a 'knowing and deliberate' nonpayment provides the basis for determining that the tax

---

[72] *See generally* United States' Trial Brief, [R. 58].

debt is non-dischargeable." *Stamper*, 360 F.3d at 557 (citing *In re Birkenstock*, 87 F.3d 947, 952 (7th Cir. 1996)).

Thus, in this circuit, to attain an exception to discharge under § 523(a)(1)(C), the government must prove, by a preponderance of the evidence, that the debtor (i) engaged in evasive conduct; and (ii) acted with knowledge or deliberation in that evasion. *Id.* at 557–58; *United States v. Storey*, 640 F.3d 739, 744–45 (6th Cir. 2011). The standard of proof notwithstanding, because an exception to discharge is a harsh remedy, actions brought to achieve this end should be "strictly construed in favor of the debtor." *Storey*, 640 F.3d at 743.

## I.    Conduct Requirement

First, the government bears the burden of proving that the debtor engaged in affirmative acts of commission or omission in order to evade payment of their federal tax obligations. *Toti*, 24 F.3d at 809; *Stamper*, 360 F.3d at 557; *Storey*, 640 F.3d at 744. Some courts have held that even a single act of commission or omission, when paired with actual nonpayment of a tax, is sufficient to constitute a willful attempt to defeat the tax. *See Gillis v. IRS* (*In re Gillis*), 251 B.R. 920, 922, 924 (Bankr. S.D. Ga. 2000) (finding plaintiff's tax debt nondischargeable under § 523(a)(1)(C) where he refused to allow IRS agent to enter his premises to execute a levy was an attempt "by the commission of a willful act" to evade payment).[73] Debtor's nonpayment of tax alone, while not sufficient by itself, is still "relevant evidence which a court should consider in the totality of conduct to determine whether . . . the debtor willfully attempted to evade or defeat taxes." *Myers v. IRS* (*In re Myers*), 216 B.R. 402, 405 (B.A.P. 6th Cir. 1998), *aff'd sub nom.*

---

[73] Notably, the Sixth Circuit has upheld exceptions to discharge under § 523(a)(1)(C) where a debtor has coupled the failure to pay taxes with other evasive actions, but has not yet decided whether a debtor's non-payment alone is sufficient to support such a determination. *See Storey*, 640 F.3d at 744 n.2. Luckily, under the facts of this case, this Court has not been called upon to answer this question.

*Meyers v. IRS* (*In re Meyers*), 196 F.3d 622 (6th Cir. 1999) (quoting *Birkenstock*, 87 F.3d at 951); *see also Stamper*, 360 F.3d at 557. In the Sixth Circuit, courts look to the "totality of conduct" to determine whether the debtor willfully attempted to evade or defeat taxes. *Myers*, 216 B.R. at 405.

### A. Secreting of Assets

The IRS argues that Stein engaged in evasive conduct when he secreted his assets by converting to a cash-only system of money management and titling property in the name of others. Indeed, acts of evasion can include, but are not limited to, "[p]lacing assets in the name of others" or "using nominee accounts" for depositing income. *Stamper*, 360 F.3d at 558. In *Stamper*, the court held that the debtor sought to evade his tax liabilities when he deposited his income in nominee accounts, meaning bank accounts maintained in the names of others. *Id.* at 559. Similarly, Stein's decision to manage his money using only cash, or cash equivalents, following the Pizza Businesses closing in 2004 resulted in the IRS's inability to levy on any personal bank accounts. Accordingly, Stein's decision to maintain a cash-only lifestyle resulted in his liquid assets remaining out of reach of the IRS and his other creditors.

Stein claims that he enjoyed visiting a multitude of physical locations during a given month to pay his bills in cash because it allowed him to engage with people. However, the Court finds Stein's testimony on this point less than credible.[74] Standing alone, the timing of his switch to a cash-only system strongly suggests that its purpose was to avoid creditors. Additionally, the results of this change—that no creditor was able to levy on any cash Stein earned after he changed his cash management habits—is strong evidence that the change was made to avoid collection

---

[74] Bankruptcy courts have the authority to determine witness credibility, and those credibility determinations are "traditionally afforded great weight." *Barrett v. Educ. Credit Mgmt. Corp.* (*In re Barrett*), 487 F.3d 353, 362 (6th Cir. 2007); *see also In re Felix*, 582 B.R. 915, 923 (B.A.P. 6th Cir. 2018).

efforts.  Finally, Deborah Stein's testimony that she and Stein were both concerned about creditors levying on their bank accounts strongly suggests the actual motivations behind the change.[75] Taken together, these facts are compelling evidence that Stein's change to a cash-only lifestyle was an affirmative act to evade paying his tax liabilities.[76]

Further, the IRS asserts that Stein's practice of titling all vehicles and real property he purchased in the names of other people or entities, which also became a habit after the Pizza Businesses' collapse, constituted evasion.  Although Stein titled his vehicles in the name of his parents or children, and this act alone demonstrates evasive conduct, his actions to conceal his ownership of the Hurdle Home are the most egregious examples of Stein's evasion.  Although Stein disclaims ever having had any ownership interest in the Hurdle Home, all his actions in relation to the property were that of an owner.[77]  Stein went to great lengths to hide his interest in this property,[78] fully aware that the IRS continued to review his file and search the public record for any assets he owned against which it could levy.  Thus, these actions demonstrate affirmative acts of evasion which prevented the IRS from levying on the property.

## B.  Excessive Discretionary Expenses

The IRS argues that Stein's choice to use his income for excessive discretionary expenditures, instead of paying his taxes, is a further example of his evasive conduct.  The failure to file tax returns or pay a tax can amount to evasive conduct within the meaning of § 523(a)(1)(C).

---

[75] Stein acknowledged that, "in a philosophical sense," a benefit of not having a bank account is the inability for creditors to levy.  June 28, 2023 Trial Transcript, [R. 121 at 202:16-18].

[76] Stein's switch to a cash-only money management system continued throughout most of the Period in Contention. *See* discussion *supra* pp. 5-8.

[77] Stein organized the acquisition and subsequent transfers of the property as well as arranged for its financing. He also paid all the expenses of acquiring and maintaining the property, from the downpayment to the monthly mortgage allotments, insurance payments, and real estate taxes. *See* discussion *supra* pp. 4-5.

[78] Stein convinced Herp to undertake the purchase transaction and place Herp's own name on the title. He then orchestrated a contract for deed sale of the property from Herp to MWNM. Finally, Stein ensured that Herp left the property to William Stein to avoid third party claims against the property.  *See* discussion *supra* pp. 4-5.

*Toti*, 24 F.3d at 809.  In *Toti*, the court held that a debtor committed an evasive act when "[h]e had the wherewithal to file his return and pay his taxes, but he did not fulfill his obligation." *Id.*  During the Period in Contention, Stein paid little, or none, of his tax obligations despite earning significant, consistent income.  Over this timeframe, Stein's average gross income was $232,664 and his average AGI was $222,536 during this period.[79]  Given these figures, absent some form of significant, necessary expense, Stein had the financial wherewithal to pay his tax obligations as they came due while also providing his family a reasonable lifestyle.[80]

Stein argues that he did not have sufficient income to pay his taxes because of the significant expenses of his law practice and household.[81]  In support, Stein provides summaries of expenses to demonstrate his annual cost of living.[82]  However, the Court finds Stein's accountings of his family and law practice expenses vague and largely inscrutable.  Certain years contain significant six-figure expenditures for "case expenses," "case costs," and "assets drawn from activity" with no further details about these expenses.[83]  Additionally, there appears to be no clear

---

[79] *See* discussion *supra* pp. 2-3.

[80] Although Stein's income fluctuated each year, his lowest reported AGI during the Period in Contention was $130,958 in 2005.  These earnings should have still been sufficient to fulfill his tax obligations while providing his family with a reasonable lifestyle, especially in conjunction with years where his earnings were much higher.  Stein's highest reported AGI during the Period in Contention was $510,885 in 2017. *See* table *supra* p. 3.

[81] Proposed Findings of Fact and Conclusions of Law, [R. 131 at 5, 7, 21, 56-57].  Regarding his law practice expenses, Stein claims his "financial circumstances became even more challenging when [he] went out on his own as a solo practitioner in 2003, which required purchasing and maintaining office furniture and equipment; paying monthly office overhead expenses; and saddled [him] with the responsibility of paying client case expenses up front. These expenses added to [his] growing list of financial responsibilities and were either marginally deductible or generally non-deductible, meaning [he] did not have as much money as his income tax returns would suggest." [*Id.* at 14].

[82] [R. 131 at 25–39].

[83] For example, in 2014, Stein alleges he spent $668,314 in case costs, without any additional breakdown or documentation, whereas in other years (e.g. 2008, 2009, 2011, and 2012) he lists no case expenses at all.  Stein's summaries are rife with other numerical inconsistencies.  Taking his 2010 summary, [R. 131 at 31–32], although Stein's gross pay was $160,555, after paying $17,609 for "expenditures," $26,870.30 for "business expenses" (some of which are duplicated in the expenditures), $137,484 in family household expenses, $13,333.33 in financial support to KD Consultants LLC (his ex-wife's business venture), $2,777 in federal, state and local taxes, and $5,000 on the Honda Odyssey, he was allegedly $24,909 in the negative that year.  Confusingly, Stein's 2010 summary lists a separate $192,307 expenditure for "case expenses" which, without explanation, is not deducted from the $160,555 gross pay.  Similarly, Stein's 2007 expense summary lists $154,181 for "assets withdrawn from activity," and his 2013 summary lists $530,148 in "case costs," but those too are not deducted from gross pay.  The fact that Stein does deduct

accounting of when Stein recouped or wrote off these expenses upon the conclusion of a particular case. Thus, the Court does not accept Stein's argument that he had insufficient income to pay his taxes due to client case expenses. Additionally, the Court does not accept Stein's household expenses as a defense to his ability to pay because his household expense summary includes several large discretionary expenses.[84]

Despite consistently earning a relatively high income during this period, Stein chose to incur large discretionary expenses instead of paying his tax obligations. Courts consider a debtor's choice to pay large discretionary expenses when determining whether that debtor engaged in evasive conduct. *See In re Jacobs*, 490 F.3d 913, 926 (11th Cir. 2007) (holding that the debtor's discretionary expenses satisfied the conduct requirement where the debtor spent $24,000 on charitable donations, thousands of dollars in gifts to his children, $20,000 on his wife's plastic surgery, over $1,000 per month for a golf club membership and other entertainment, and between $600 and $700 per month on a leased Mercedes-Benz); *Volpe v. IRS* (*In re Volpe*), 377 B.R. 579, 587 (Bankr. N.D. Ohio) (finding that the debtor engaged in evasive conduct where he failed to pay taxes "even though he had enough money to pay for non-necessities such as . . . private school"). Thus, Stein's discretionary expenses, when combined with his failure to meet his tax obligations during a time when he had the financial wherewithal to pay, highlights the evasive nature of his conduct.

Stein's discretionary expenditures were large enough that, if he chose to divert them to his tax obligations, he could have substantially reduced, or eliminated, his tax burden. During the

---

"unreimbursed case expenses" from his gross pay suggests that the other, larger categories of "case expenses" were reimbursed, but that remains unclear. Further, on more than one occasion, the gross incomes in Stein's summaries (e.g. $173,934 in 2014) are different than the IRS's figures ($250,977 in 2014) which are based on Stein's own returns. Without more, Stein's summaries lack clarity and do not illustrate an accurate accounting of his income or expenses.
[84] Stein's "Household Expense" summaries, [*id.* at 25–26], estimates that he spent $137,484 every year from 2006 until 2015. This estimate includes, among other things, $1,500/month in rent payments ($18,000 per year), $3,000/month in tuition payments ($36,000 per year), and $1,250/month in charitable donations ($15,000 per year).

Period in Contention, Stein's expenses included nearly $300,000 for private school and college tuition and approximately $70,000 in loan repayments to family. Stein also purchased vehicles for his children, contributed to Deborah's business, and put a down payment on the Hurdle Home.[85] Stein's tuition payments alone during the Period in Contention were more than four times greater than the amount he paid on his tax obligations.[86] Meanwhile, Stein was accumulating significant debt to the IRS for back taxes. Thus, Stein chose to educate his children at expensive private schools and make other discretionary expenses instead of satisfying his obligation to pay taxes.

Stein argues that the tuition payments were not true discretionary expenses, but expressions of his religious faith and familial tradition.[87] He further asserts that he needed to keep his children in these schools to maintain normalcy after the loss of their home to foreclosure in 2004.[88] However, Stein testified that sending his children to private schools was a choice and that he never considered alternatives.[89] Further, courts have held that the Free Exercise Clause of the First Amendment does not afford debtors the right to choose faith based financial obligations over the payments of taxes. *See Colish v. United States* (*In re Colish*), 289 B.R. 523, 535 (Bankr. E.D.N.Y. 2002) (finding that there is "no basis for finding a right, constitutional or otherwise, to pay religious school tuition in preference of tax obligations"); *Kerger v. United States*, 609 F. Supp. 3d 562, 574 (N.D. Ohio 2022) (finding that the payment of discretionary expenses such as tithes could not be funded through the non-payment of taxes). Thus, Stein's choice to fund his sons' private religious education instead of paying taxes may have been an "understandable and even [a] commendable

---

[85] It is worth noting that the IRS calculates Stein's total discretionary spending during the Period in Contention as approximately $1.1 million, a sum which exceeds his tax obligation. The IRS' calculation has substantial evidentiary support, but out of an abundance of caution the Court has utilized fewer expenses and, therefore, a lower overall amount of discretionary expenditure.

[86] During the Period in Contention, Stein spent about $274,390 on tuition and paid $65,321 in taxes. *See* discussion *supra* pp. 8, 10.

[87] Debtor/Plaintiff's Post-Trial Brief, [R. 131 at 6].

[88] [R. 131 at 6].

[89] June 28, 2023 Trial Transcript, [R. 121 at 43:6-9].

one . . . [b]ut not one that exempts the obligation to pay one's taxes." *Kerger*, 609 F. Supp. 3d at 574.

### C.  Engagement With the IRS

The IRS points to Stein's prior engagements with the agency as further evidence of Stein's evasive conduct.  Specifically, the IRS asserts that during the Period in Contention, Stein's conduct resulted in the delayed assessment, and avoided collection, of his tax liabilities.  Misleading the IRS in an attempt to persuade revenue agents to defer collection activity can constitute evasive conduct under § 523(a)(1)(C).  *Stamper*, 360 F.3d at 560.  In *Stamper*, the court held that the conduct element was established where the IRS proved that the debtor persuaded revenue agents to defer collection activity by promising to pay his outstanding tax debt with proceeds from pending settlements, but ultimately failed to do so.  *Id.*  Therefore, a debtor's interactions with the IRS are relevant to determining whether he or she engaged in evasive conduct.

Here, Stein employed multiple strategies in his engagements with the IRS which led to delayed assessment or collection of his tax liabilities.  For example, by routinely seeking extensions of the filing deadline, Stein delayed the IRS's assessment of his tax liabilities by up to six months for each year he owed taxes.  The IRS provided evidence that, over the course of the Period in Contention, Stein created a total cumulative delay in assessment of seven years.  Moreover, although Stein filed his tax returns by the extended due date, he failed to make any payments with his extension requests or tax returns.  Thus, Stein's extensive use of extension requests appears to be a method to delay and mislead the IRS, rather than an honest attempt to pay his taxes.

When the IRS attempted to collect his taxes, Stein further delayed its ability to collect by feigning cooperation with the agency.  On several occasions, often in response to IRS collection

attempts, Stein represented to the IRS that his financial position had improved and that he was willing and able to make payments on his tax debt.[90]  Despite pausing its collection activity after Stein agreed to begin paying, Stein never followed through on his promises and his debt to the IRS continued to grow.  Stein's failure to follow through on these promises, which he made following collection attempts, strongly suggests that he feigned cooperation to further hinder the IRS's ability to collect his taxes.

The IRS also ceased collection activity in 2005 and 2009 after it determined that Stein did not have any significant assets upon which it could levy.  Each hardship designation resulted in the IRS ceasing collection activities for about a year and half, which resulted in a total of three years during which the IRS was not attempting to collect from Stein because they believed he had no significant assets.  However, as discussed above, Stein hid his assets from the IRS through his exclusive use of cash and titling property in the names of others.  Further, throughout this period Stein was paying for his sons to attend expensive private schools, funding his wife's business, and purchasing the Hurdle Home.  This spending behavior indicates that Stein actually did have significant assets which could have been diverted towards his tax liability.  Therefore, Stein misled the IRS by secreting his assets, which led to another three years of avoided collection.

The evidence presented by the IRS shows that Stein secreted his assets, spent large sums on discretionary expenses when he had the financial ability to pay his taxes, and mislead the IRS to delay its assessment and collection of his taxes.  The IRS established that, based on the totality of his conduct, Stein engaged in evasive conduct sufficient to satisfy this component of § 523(a)(1)(C).

**II.    Mental State Requirement**

---

[90] *See* discussion *supra* pp. 11–12.

To satisfy the mental state component of § 523(a)(1)(C), the government must show by a preponderance of the evidence that the taxpayer's evasive conduct was "voluntary, conscious, and intentional." *Toti*, 24 F.3d at 809.  In other words, the debtor must have (a) had a duty to pay taxes, (b) known he had that duty, and (c) voluntarily and intentionally violated that duty. *Stamper*, 360, F.3d at 558 (citing *United States v. Fretz* (*In re Fretz*), 244 F.3d 1323, 1330 (11th Cir. 2001)). Stein admitted to the first two prongs of the mental state test during his testimony under cross-examination by the IRS.[91]  Thus, the only question remaining in this case is whether Stein voluntarily and intentionally violated his duty to pay taxes.

The purpose of requiring a voluntary and intentional violation of the debtor's duty is to "[prevent] the application of the [discharge] exception to debtors who make inadvertent mistakes, reserving nondischargeability for those whose efforts to evade tax liability are knowing and deliberate." *Birkenstock*, 87 F.3d at 952.  Specific intent to defraud the IRS is not required to satisfy this element.  *United States v. Coney*, 689 F.3d 365, 374 (5th Cir. 2012).  Rather, it is enough that the debtor "voluntarily and intentionally committed or attempted to commit an affirmative act or culpable omission that, under the totality of the circumstances, constituted an attempt to evade or defeat the assessment, collection, or payment of a tax." *Id.*  Because "there is rarely direct proof of a debtor's intent, intent may be proven by circumstantial evidence." *Volpe*, 377 B.R. at 586.  Therefore, the question is whether, based on the totality of the debtor's conduct, he or she voluntarily and intentionally acted in a manner to evade or defeat the assessment or collection of taxes. *See Coney*, 689 F.3d at 374.

The IRS presented three categories of evidence which demonstrated that Stein acted willfully in his attempts to evade payment or collection of his taxes.  First, Stein consistently failed

---

[91] June 28, 2023 Trial Transcript, [R. 121 at 9:25–10:5].

to pay taxes while simultaneously having the income to do so.  Instead, he consistently chose to pay significant discretionary expenses.  A debtor's financial ability to pay taxes and a debtor's discretionary spending are both relevant considerations when assessing whether nonpayment was voluntary and intentional.  *See, e.g.*, *Toti*, 24 F.3d at 809 (considering financial ability to pay taxes); *United States v. Mitchell* (*In re Mitchell*), 633 F.3d 1320, 1329 (11th Cir. 2011) (considering discretionary spending to establish the mental state requirement).  Therefore, Stein's ability to pay his taxes and his discretionary spending are part of the totality of conduct relevant to establishing the mental state component.

Stein claims that he had insufficient income to pay his bills as they came due, forcing him to pay other, urgent bills instead of his taxes.  However, the evidence shows that Stein voluntarily prioritized the payment of significant discretionary expenses instead of paying his taxes.  For example, Stein spent nearly $300,000 in private school tuition[92] and made mortgage, property tax, insurance, and maintenance payments for the Hurdle Home during this period.  There is no evidence in the record that Stein ever failed to pay these obligations.[93]  Simply put, Stein consistently chose during the Period in Contention to pay other expenses instead of paying his taxes.  These expenses were not constrained to a single year or dotted sporadically over the period.  Thus, the consistency of his choice to pay other expenses instead of his taxes strongly suggests that this was a voluntary and intentional decision.

Second, Stein voluntarily and intentionally hid interests in assets to prevent creditors, or the IRS, from levying upon them.  A debtor's attempts to conceal income and assets are relevant

---

[92] Stein claims that these tuition payments were expressions of his religious faith and familial tradition, but this argument was already addressed above.  *See* discussion *supra* p. 22.

[93] Although Stein argues that his sons' private school afforded him leniency in the timing of his payments, he provided no evidence to suggest that his payments were delinquent.  Additionally, Stein never suggested that he needed school financial, or familial, assistance in making these payments.  Instead, the evidence demonstrates that he simply made these tuition payments year after year as his tax obligations increased.  In certain years, Stein's tuition payments even exceeded his tax obligations for that year.

considerations when determining whether the mental state component is met.  *See, e.g.*, *Stamper*, 360 F.3d at 558; *Mitchell*, 633 F.3d at 1329; *Myers*, 216 B.R. at 405; *Volpe*, 377 B.R. at 584; *In re Candy*, 625 B.R. 701, 713 (Bankr. W.D. Tenn. 2021).  In *Stamper*, the court held that the government established a conscious intent to evade tax payment by showing that the debtor concealed his income when he put it in bank accounts in the names of others.  *Stamper*, 360 F.3d at 559–61.  Similarly, in *Volpe*, the court found that the debtor voluntarily and intentionally violated his duty to pay taxes when he concealed a real estate asset by holding the property in another person's name.  *Volpe*, 377 B.R. at 584.  Thus, Stein's efforts to conceal assets are relevant to determining whether he willfully evaded paying his taxes.

Stein used several methods to conceal his assets during the Period in Contention.[94]  Most notably, he used a cash-only system and titled the Hurdle Home under the name of an LLC he created.  Stein acknowledged during his testimony at trial that he began using these methods of asset management after his Pizza Business creditors began collection activity.  The timing of this change in Stein's asset management strategies suggests that it was an attempt to avoid collection activity.

Stein argues that he chose to pay his bills in cash because cash was more convenient.  However, as discussed above, the court does not find this statement credible.  Additionally, he admitted that preventing creditor levies was a "secondary consideration" for moving to a cash-only system.  Stein further argues that he never owned the Hurdle Home and that he undertook the transaction to obtain that property with the intent to create a real property investment for his sons.  But Stein admitted that he created MWNM to hold title to the property because he was aware that

---

[94] *See* discussion *supra* pp. 17–19.

creditors would foreclose on any real property acquired in his name.[95]  Further, the evidence shows that although Stein did not place his name on the deed, he paid for all expenses to acquire and maintain the property while also using and enjoying the property in a manner consistent with ownership.  Therefore, the totality of Stein's conduct indicates that he voluntarily and intentionally hid assets to prevent or delay IRS collection activities.

Third, Stein's interactions with the IRS show that he was not forthright with the agency about his assets.  For example, during a meeting with the IRS in 2012 to discuss his delinquent taxes, Stein claimed to have a settlement payment forthcoming which he would apply to his tax debt.  However, Stein did not pay the IRS after he received the settlement funds.  Additionally, after the IRS placed a nominee lien on the Hurdle Home, Stein told the agency that the $73,000 needed to satisfy the lien would come from his son and John Whatley because they owned the home.  But Stein satisfied the loan instead, borrowing $50,000 from his wife's cousin and paying $23,000 from funds he had on hand.  Stein later repaid the loan from his wife's cousin with interest, choosing to satisfy this obligation instead of paying his taxes.  These incidents expose Stein's mental state because they demonstrate his willingness to lie to the IRS to avoid or delay collection efforts.

* * * * *

For the reasons set forth above, the IRS has demonstrated that Stein's actions meet the requirements of the § 523(a)(1)(C) test.  Therefore, Stein's tax obligations for the years 2002, 2003, 2005 through 2015, and 2017 are excepted from discharge.  A separate judgment excepting Debtor's tax debt from discharge will be filed contemporaneously with this memorandum opinion.

Charles R. Merrill
United States Bankruptcy Judge
Dated: November 20, 2024

---

[95] Stein explained that, at the time of the Hurdle Home transaction, he needed a place to live with his family and "didn't want any of the property to be foreclosed on or . . . liens put all over it."  [R. 121 at 73:4–11].

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MATTHEW W. STEIN, | ) | Case No. 3:21-32162 |
| | ) | |
| Debtor | ) | Chapter 7 |
| | ) | |
| _____ | ) | |
| | ) | |
| MATTHEW W. STEIN, | ) | Adversary Proc. No. 22-3004 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| c/o Internal Revenue Service, | ) | |
| | ) | |
| Defendant. | ) | |

\* \* \* \* \*

**ORDER**

This matter is before the Court on the Adversary Complaint of Debtor-Plaintiff Matthew Stein, [R. 1], in which Stein requests that the Court enter a judgment declaring that the federal income tax liabilities listed in his schedules are dischargeable.  In response, the United States, on behalf of the Internal Revenue Service ("IRS"), seeks a judgment excepting from discharge $1,074,180.57, a sum that represents Stein's unpaid federal income taxes in 2002, 2003, 2005 through 2015, and 2017.  Between June 27 and June 29, 2023, the Court conducted a three-day trial on this matter.  In light of the testimony and arguments presented, and having considered the matter fully, and being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Debtor's tax obligations for the years 2002, 2003, 2005 through 2015, and 2017 are excepted from discharge.

Charles R. Merrill
United States Bankruptcy Judge
Dated: November 20, 2024